### TYLER v. FELDMAN et al.
### No. 16121.

Court of Appeal of Louisiana. Orleans.
June 10, 1935.

Normann & McMahon and Harold M. Rouchell, all of New Orleans, for appellant.

Scott E. Beer, Walter M. Barnett, Jr., and Jos. G. Dempsey, Jr., all of New Orleans, for appellee.

WESTERFIELD, Judge.

This is a suit for $14,280, as damages for physical injuries. The allegations of the petition are that on October 1, 1933, while plaintiff was standing on the sidewalk on the uptown side of Washington avenue and gazing into the showcase of one Isidore Steinman, whose place of business is located at the corner of Washington avenue and magnolia street, an automobile owned by Jacob Nienaber and driven by Abraham Peck collided with an automobile owned and driven by Benjamin Feldman in the intersection of Washington avenue and Magnolia street, with the result that the Peck car ran upon the sidewalk, crashed into the Steinman showcase, and struck and injured plaintiff, causing him to be permanently disabled.

The suit was originally brought against Benjamin Feldman, Jacob Nienaber, and the Crescent City Ice Company, Inc., the employer of Nienaber and Peck.

The trial court maintained exceptions of no cause of action filed on behalf of Nienaber and the Crescent City Ice Company, Inc., and

plaintiff has acquiesced in the judgment of court in this respect, and these parties are no longer involved in this suit. Peck, the driver of the Nienaber car, was not sued. There was judgment below in favor of plaintiff and against the remaining defendant, Feldman, in the sum of $5,000, and he has appealed.

Among other charges of negligence, it is claimed that Feldman was operating his automobile at an excessive speed, with defective brakes, and in disregard of the applicable provision of the traffic ordinance. The issue in the case, as developed below, and as presented in this court, appears to depend solely upon the question of fact as to whether the defendant violated subsection A of section 3, article 111 of the Traffic Ordinance No. 13,702, C. C. S., which reads as follows:

"Whenever traffic at an intersection is controlled by traffic control signals exhibiting colored lights or the words 'Go', 'Caution', and 'Stop' said light and terms shall indicate as follows:

" 'Green' or 'Go'—Traffic facing the signal may proceed, except that vehicular traffic shall yield the right of way to pedestrians and vehicles lawfully within a crosswalk or the intersection at the time such signal is exhibited.

" 'Amber' or 'Caution' or 'Walk', when shown alone following the green or 'go'— Traffic facing the signal shall stop before entering the nearest cross-walk at the intersection unless so close to the intersection that a stop cannot be made in safety.

" 'Red' or 'Stop'—Traffic facing the signal shall stop before entering the nearest crosswalk at the intersection or at such other points as may be designated by the Commissioner of public safety and remain standing until green or 'go' is shown alone * * *."

The contention of plaintiff is that the Feldman car, which, just prior to the accident, was being driven out Washington avenue in the direction of the lake, entered the intersection of Magnolia street when the traffic signal showed red at a high rate of speed, and collided with the automobile driven by Abraham Peck in about the center of the intersection and thereafter traversed about a third of a city block and mounted the sidewalk curb on Magnolia street, Feldman having turned his car to the left and into Magnolia street in a belated and futile effort to avoid the accident.

On the other hand, defendant contends that he was driving cautiously and slowly and entered the intersection on the green light, and that the accident was entirely due to Peck's negligence in failing to observe traffic regulations by entering the intersection on a red light and in driving recklessly and at excessive speed.

In the Feldman car at the time of the accident there were, besides the driver and owner, Benjamin Feldman, his wife, Mrs. Feldman, and his father, William Feldman, and two small children, nieces of Benjamin Feldman. The three adults testified to the same effect and in substance that, when the Feldman car was about 75 feet from the intersection, the traffic light changed from red to amber, and that, before entering the intersection, at a speed of about twenty miles an hour, it had changed to green. The learned judge of the trial court apparently based his judgment entirely upon the conclusions he drew from the testimony of the defendant, as appears from the following excerpts from his reasons for judgment:

"Now, in this case, there is no shadow of a doubt in my mind that Peck, the negro who was driving up Magnolia street with another negro named Landry, who was sitting on the driver's seat with him, on his right, on arriving at Fourth Street, one block immediately below Washington Avenue or Fifth Street, found the light at the intersection of Washington Avenue and Magnolia Street, green, and it is positively fixed in my mind, that as he came up the square between the two streets there, that I have mentioned, and while he was approximately seventy-five feet away from the intersection, the green light, which had been confronting him, turned to amber and notwithstanding the warning given to him by Landry, his friend, who was sitting beside him, he undertook to crash the intersection.

"It is equally plain to my mind, that taking the testimony of the defendant, Mr. Feldman, as true, to the best of Mr. Feldman's knowledge and belief, the fact is, he had his father sitting beside him on the front seat, his wife and two nieces in the body of the car, according to his own testimony, when he was seventy-five feet away from the intersection of Washington Avenue and Magnolia street, the red light which had been confronting him at this moment, turned from red to amber.

"It is also plain from his own testimony that he continued straight along. He said he pulled his lever to change his gears from third to second and instantly returned it to third gear, without knowledge of his inertia. We know that the declining speed, if any, by that maneuver, was absolutely infinitesimal.

"Now he testifies to the best of his recollection, he was driving from eighteen to twenty-two miles an hour. Giving him the best of that testimony, dividing those four miles by two, it woud make his speed twenty miles an hour.

"An automobile making twenty miles an hour, by mathematical calculation, is making thirty feet per second, so, therefore, in two and a half seconds from the time that the red light in front of Mr. Feldman turned to amber, in those two and a half seconds he was in the intersection.

"Now, Mr. Fager, an employee of the City of New Orleans, in charge of those semaphore lights, gave uncontradicted testimony, which I must accept as true, that by machinery automatically operated, those semaphores on the amber light stay on ordinarily for five seconds and no more and as slow as four seconds and no less. He testified that inattention to the mechanism or any undue outside manipulation thereto, could lengthen the time, but it is impossible to shorten it. So, if we take the best that Mr. Fager says, four seconds, Mr. Feldman went into that intersection on the amber light, just as did the negro, Peck, driving up Magnolia Street. * * *

"Feldman, in attempting to avoid a collision that he saw was going to occur within a split fraction of a second, swerved violently to the left to go up Magnolia Street. The negro, Peck, kept straight on. When the two of them came together both vehicles had their power on, their motors operating and turning the wheels. The impact caused the negro, Peck, to entirely lose control of his machine and it turned to the right and ran up on the sidewalk on the upper, lake corner of Magnolia and Washington Avenue, inflicting the injuries on this old negro, Tyler, which have been testified to in this case."

Counsel for Feldman objects to the mathematics used by the trial court upon the ground that "mathematical speed calculations and problematical estimates" are "in direct conflict with a doctrine only recently denounced and rejected by your honors in the case of Favaza v. New Orleans Public Service, Inc. [La. App.] 154 So. 457 [461]": We have examined the Favaza Case with counsel's criticism in mind, and have failed to find the contradictory doctrine referred to. Counsel directs our attention to the following excerpt from the opinion in that case:

"This line of reasoning is unsound also because it fails to take into consideration that the driver of the Ford automobile accelerated the automobile in an effort to get across after noticing the street car. It further ignores the fact that plaintiff's own witness Stern states that the street car was about 15 or 18 feet from the corner at the time the Ford automobile reached the car tracks."

We see nothing in this language denunciatory, or even critical, of the practice of calculating the progress of automobiles by estimates of speed given by witnesses in order to appraise the probability and value of their testimony. Of course, if it should appear that one factor in the problem, such as the speed of the automobile, is not constant, as was true in the Favaza Case, then, as was said there, the reasoning is unsound.

██ But if we reject the mathematical calculations complained of and ignore for the moment the defendant's evidence, and turn to the testimony of plaintiff's witnesses, we find that three eyewitnesses to the accident, Andrews, Dolliolle, and Morrison, stated that the Feldman car entered the intersection on the red light. It is said that these witnesses are unreliable because their situation at the time of the accident with respect to the locus in quo afforded little opportunity for accurate observation and for other reasons. For example, the witness Elton Andrews testified that Peck was alone in his car, whereas, as a matter of fact, the witness Landry was with him, and also that Peck had a coat on and was a tall and dark-skinned negro, whereas Peck testified that he had no coat on and was wearing a green uniform at the time. Andrews was standing on the second-story gallery of a house once removed from the corner of Washington avenue and Magnolia street, which may account for his failure to discover the green uniform, but there is nothing to indicate that he could not see the semaphore signals, as well as if much nearer the intersection. Dolliolle testified that the Feldman car was gray, whereas Mr. Feldman stated that his car was blue, with a red stripe. Morrison was most reluctant to acknowledge that he was a negro when questioned on that point, and counsel impugns his evidence because he "attempted to appear as a disinterested white witness until a chance question disclosed that he was a colored man." The doctrine "falso in uno, falsus in omnibus" is invoked. It is said that the trial judge stated from the bench that he did not believe any of these witnesses, and that statement is made in an application for a new trial presented to the district court.

However, we find nothing in the record indicating what the opinion of the trial judge

was upon the credibility of the evidence given by these witnesses. On our own account, we are of opinion that the discrepancies pointed to are insufficient to warrant the rejection of the testimony as unworthy of belief.

It is suggested by certain interrogatories propounded by plaintiff's counsel that Feldman was in a hurry to get to a circus performance at 1:30 as possibly accounting for his speed and recklessness in traversing the intersection at 1:15 p. m., the time of the accident. It may be that Feldman was influenced by the considerations mentioned, but, in any event, the conclusion is inescapable from the evidence in the record that he entered the intersection in violation of the traffic ordinance, and that such violation contributed to the accident.

The injuries of plaintiff, who was an old negro, consisted of a broken femur of the left leg, which resulted in its shortening by 2½ inches. He testified that before the accident he was employed by New Orleans University for fourteen years, as janitor, at a monthly wage of $30; that since the accident, which occurred October 1, 1933, he has not been able to walk except with the aid of crutches, and cannot perform work of any character. Dr. Rosen, who examined plaintiff sixteen months after the accident and a short time before the trial of the case, described his condition as permanent, and stated that he could not do any kind of work that required walking.

Under the circumstances, we will not disturb the award of the trial court.

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.